251 Kan. 179 (1992)
833 P.2d 979
GLORIA G., et al., Appellees,
v.
STATE DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, Appellant.
No. 66,518
Supreme Court of Kansas.
Opinion filed May 22, 1992.
Roberta Sue McKenna, of Department of Social and Rehabilitation Services, argued the cause, and Michael George, of the same agency, was with her on the brief for appellant.
Jerry K. Levy, of Topeka, argued the cause and was on the brief for appellees.
The opinion of the court was delivered by
SIX, J.:
This case concerns the liability of the Kansas Department of Social and Rehabilitation Services (SRS) for damages caused by its removal of a child from a foster care home. Does the discretionary function exception of the Kansas Tort Claims Act (KTCA), K.S.A. 75-6104(e), apply?
Gloria G. filed the instant personal injury action on behalf of her adopted son, A. She sued SRS, alleging that A. incurred emotional and psychological damage as a result of the SRS decision to remove A. from a foster home in 1980. A. was placed with Gloria, who adopted him two years later. SRS appeals from a judgment entered on a jury verdict finding SRS 30% at fault and awarding A. $187,000 as SRS's share of the total damages.
Our jurisdiction is under K.S.A. 20-3018(c) upon transfer from the Court of Appeals. We hold that SRS is immune from liability under the discretionary function exception of the KTCA. We reverse the trial court and enter judgment for SRS.
*180 Facts
A. was born on January 13, 1975. His biological parents were a Caucasian mother and an African-American father. As a prologue in the factual recitation, we note the chronology of A.'s placements and the reasons for placement change.
In February 1976, at the age of 11 months, A. was placed in SRS custody because he was abused and neglected by his biological parents. His older brother, D., born February 6, 1974, was also placed in SRS custody.
From February 1976 to June 1976, A. and D. were in the Nelson foster home, Mrs. Nelson requested the removal of A. and D. Her husband was threatening to leave because A.'s whining was getting on his nerves. From June 1976 to July 1976, A. was separately placed in the Smith foster home. In July 1976, A. was returned to his biological mother. A. was removed from his mother's home later that month and admitted to the University of Kansas Medical Center (UKMC) with a diagnosis of child abuse (a broken wrist, facial bruises, and swelling of the forehead).
A. remained in UKMC until the end of July 1976, when he was placed in the emergency care foster home of Diana and Richard Goza. In August 1976, A. was moved from the Goza foster home to the Gregory foster home. (A later removal from the Goza home is the event that brings SRS into the instant lawsuit.) In September 1976, A. was removed from the Gregory home and placed back with the Gozas because the Gregorys were unable to deal with A.'s temper tantrums. A. remained in the Goza foster home until August 1980, when SRS removed him as a result of a sexual manipulation incident involving the Gozas 12-year-old daughter. A. was placed in another emergency care foster home. A. later resided in a foster home in Leavenworth. All of A.'s previous foster homes had been in Kansas City, Kansas.
In November 1980, after various visits, A. was placed, on an adoptive basis, in the Topeka home of Gloria G., a single African-American woman. On March 1, 1982, Gloria formally adopted A.
The district court of Wyandotte County severed the parental rights of A.'s biological parents in August 1977. The severance became final on January 19, 1978, when the Court of Appeals, in case No. 49,544, dismissed the biological parents' appeal for *181 failure to comply with Supreme Court Rule 6.01 (1991 Kan. Ct. R. Annot. 24).
SRS could not form adoption plans for A. until the severance of parental rights had become final. In February 1978, following severance finalization, SRS developed a goal for permanent placement of A. and D. SRS's objective was to find a bi-racial or African-American, two-parent family, preferably outside of the Kansas City area, to adopt both boys. SRS's reasons for this plan were: (1) D. especially identifies with African-Americans; (2) it would be best to place the boys outside of the Kansas City area because of the possible interference by the biological father and the easy identification of the boys; and (3) the siblings have a significant relationship and need to be placed with a family that wants two boys.
While A. was living in the Goza foster home, D. Was placed with Ms. Ford, also in Kansas City. Ms. Ford was a single African-American woman. During this time, SRS had arranged visitation for the two boys so that they could maintain contact with each other.
The Gozas had officially applied to adopt A. They did not express an interest in adopting both boys. Although Ms. Ford requested adoption of both boys, she was not allowed to because she lived in Kansas City a few blocks from the biological father.
In March 1978, a notice of action was sent to the Gozas informing them of the SRS goal of joint adoption with a bi-racial or African-American two-parent family and of the decision not to pursue adoption with the foster parents. The Gozas were informed of their right to appeal the decision. They did not appeal.
A. and D. were referred to Black Adoption Program and Services (BAPS), which operates under the Kansas Children's Service League and deals with the recruitment of homes for adoption of minority children. By May 1979, BAPS had not located a suitable African-American or bi-racial family. SRS began to consider the Gozas and Ms. Ford for adoption along with any family BAPS would locate. In October 1979, A. and D. were referred to ARENA, a national adoption recruiting service which recruits families of all ethnic backgrounds.
In January 1980, Dorothy Patterson-Warren, the SRS social worker assigned to A., met with Mr. Goza to discuss adoption *182 of A. In her deposition, Mrs. Warren testified that following this meeting she concluded that Mr. Goza was not as committed to adopting A. as was Mrs. Goza. After Mrs. Warren's discussion with Mr. Goza, despite her conclusion, SRS was still considering the Gozas for adoption of A.
In March 1980, A. and D. were de-referred from BAPS and their profiles were sent to other adoption exchanges. SRS determined that if no resources were found by May 1, 1980, SRS would pursue adoption by the foster parents. In May 1980, SRS planned to place A. with the Gozas on an adoptive basis after an approved adoptive home study was completed. In reaching the Goza placement decision, the SRS staff considered the following pros and cons concerning an adoptive placement with the Gozas.
Pros:
1. Mrs. Goza is committed to A.;
2. A. has been with the Gozas since September 1976; and
3. A. was referred to BAPS and ARENA and no resources were found.
Cons:
1. A. is a bi-racial child in an all-white home;
2. The Gozas provide emergency foster care which creates constant turmoil and changes in the home;
3. Mr. Goza is not as committed to adopting A. as is Mrs. Goza;
4. The foster children constantly coming and going to the foster home will remind A. of his status; and
5. A.'s biological family is in the community and he is identifiable.
An adoption placement cannot be completed until a home study is completed. In June 1980, SRS initiated a referral to an adoption unit to complete a home study of the Gozas. SRS mandates that a home study be completed in 90 days. The Goza home study was not completed before A.'s removal from the Goza home.
In January 1981, SRS placed D. with Ms. Ford on an adoptive basis. Ms. Ford eventually adopted D.
A.'s Removal
From June through August 1980, Mrs. Goza and her 12-year-old daughter, A.G., were in counseling for family matters with a social worker and counselor. In August 1980, Mrs. Goza called *183 the counselor and told her that on August 12, 1980, A.G. had been found in an upstairs bedroom manipulating A.'s penis and A. had been fondling A.G.'s breast. A. was five years old at that time. The counselor reported the incident to the SRS. She also reported her concerns relating to the emotional neglect of A.G. by her parents. The counselor stated that under the laws governing her work, she was obligated to report such incidents or allegations. The counselor recommended that Mrs. Goza discontinue foster care and focus on helping A.G. overcome her problems. Mrs. Goza also reported the incident to SRS.
Following the sexual incident report, the Protective Services Unit of the SRS investigated. Two SRS workers visited the Goza home and interviewed A.G., A., Mrs. Goza, and the other foster children in the home. A committee met after the incident was investigated, reviewed the information, and confirmed a finding of sexual abuse. (The investigation file was destroyed in 1982 in accordance with SRS policy.) A staffing team at SRS decided to remove A. from the Goza home. The other foster children were also removed. SRS attempted to minimize the trauma to A. resulting from the removal from the Goza home. The SRS workers who picked up A. wanted the Gozas to help A. understand the removal. SRS also was interested in arranging visits with A. and the Gozas. The Gozas did not participate.
Following A.'s removal, the Gozas no longer participated in foster care. The Gozas did not appeal the SRS decision to remove A.
Procedural History
Gloria filed an action asserting her individual damage claim in November 1985. She alleged that SRS failed to disclose A.'s known emotional and behavioral problems prior to placement and adoption. In November 1987, she filed an amended petition adding a claim on behalf of A. (A.'s claim is before us in the case at bar.) She alleged SRS caused A. emotional damage in breaching a duty to protect A.'s best interest by: (1) denying the Gozas, based on race, the possibility of adopting A. and (2) removing A. from the Gozas home because of an unsubstantiated report of sexual abuse.
*184 The Rulings of the Trial Court
SRS filed a motion to dismiss, asserting immunity under K.S.A. 75-6104(e), the discretionary function exception to the KTCA. The trial court in the pretrial order denied the motion to dismiss.
After extensive discovery, SRS filed a motion for summary judgment, again advancing the governmental immunity under the discretionary function exception to the KTCA. The factual development related herein was before the trial court on summary judgment. Gloria, for herself and on behalf of A., opposed the summary judgment motion.
The SRS motion for summary judgment was denied. The trial court reasoned that there was at least a reasonable inference that SRS used solely race in making its decision not to place A. in the Goza home for adoption in violation of constitutionally prohibited racial discrimination. With regard to A.'s claim of injury due to his abrupt removal from the Goza home, the trial court reasoned that the finding of sexual abuse and subsequent removal was mechanical rather than a discretionary act. The trial court found that sexual abuse could not have occurred under the definition of "sexual abuse" in the SRS Manual of Services to Children and Youth:
"Abuse
"An act of commission by a parent or caretaker which is not accidental and harms or threatens to harm a child's physical or health or welfare.
....
"C. Sexual Abuse
"Child abuse which results in any act of a sexual nature upon or with a child."
The trial court reasoned that A.G.'s acts, in the case at bar, were not the acts of a parent or caretaker and that, therefore, SRS had confirmed a finding of sexual abuse contrary to its own regulations.
The two claims, Gloria's and A.'s, proceeded to trial in November 1990. A. was 15 years old at the time of trial. After Gloria rested, SRS moved for dismissal and for a directed verdict. SRS argued that Gloria, in A.'s behalf, had not shown that the alleged actions of SRS caused A.'s emotional problems. SRS presented evidence and rested its case. At the close of all the evidence, SRS renewed its motion for a directed verdict on Gloria's claim. *185 SRS did not renew its motion for a directed verdict on A.'s claim. The trial court denied the motions for a directed verdict.
The case was submitted to the jury.
The jury on Gloria's claim, found Gloria 50% at fault and SRS 50% at fault, assessing Gloria's damages at $40,000, and, on A.'s claim, determined fault as follows: SRS 30%, A.G. 5%, Mr. and Mrs. Goza 5%, and the biological parents of A. 60%. The jury assessed A.'s total damages at $625,000, allocated as follows: $125,000 in future medical expense, $200,000 in non-economic loss to date, $100,000 in future non-economic loss, and $200,000 in future economic loss. The trial court entered judgment against SRS on A.'s claim in the amount of $187,000 (We note that 30% of $625,000 is $187,500; however, the journal entry entered judgment for $187,000 and has not been corrected.). SRS was the only defendant. Gloria, on behalf of A., did not assert claims against the other persons whose fault was compared at trial. Based on the jury's finding of Gloria's 50% fault, the trial court entered judgment for SRS on Gloria's claim.
SRS filed a motion for a new trial and to amend the judgment. In its motion, SRS raised, in addition to other issues, discretionary function immunity, alleging the trial court failed to instruct on the discretionary function exception.
The trial court denied SRS's motion for a new trial and to amend the judgment. With regard to discretionary function immunity, the trial court reaffirmed its ruling on summary judgment, stating that the issue of governmental immunity based on the discretionary function exception was fully addressed in its decision denying SRS's motion for summary judgment. The trial court then reasoned that the question of the discretionary function immunity was one for the court and not the jury, and, therefore, the requested discretionary function immunity instruction was properly denied. The trial court denied the motion for a new trial.
SRS filed a notice of appeal, appealing "the order dated March 7, 1991, and overruling the Defendant's Motion for a New Trial." Gloria has not appealed the judgment entered for SRS on her claim.
*186 SRS asserts that it is entitled to judgment as a matter of law for A.'s claims because SRS's actions were discretionary, entitling SRS to immunity under K.S.A. 75-6104(e). We agree.
Summary Judgment
A prologue to any analysis of a summary judgment issue is the recitation and acknowledgment of the movant's burden and of our scope of appellate review. The burden of the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Bacon v. Mercy Hosp. of Ft. Scott, 243 Kan. 303, 306-07, 756 P.2d 416 (1988).
Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When summary judgment is challenged on appeal, we must read the record in the light most favorable to the party who defended against the motion for summary judgment. Patterson v. Brouhard, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).
Contentions of the Parties
SRS does not deny that race was one of the criteria for the selection of adoptive parents for A., asserting that race is a proper consideration so long as it is not the sole criterion. SRS contends that A. was removed from the Goza home not because of his race, but because SRS had made a confirmation of sexual abuse of A. by A.G. SRS argues the decision to remove A. from the Goza foster home was a discretionary act entitling SRS to immunity.
A. argues that SRS has not demonstrated its entitlement to discretionary immunity. A. claims SRS was at fault in two particulars: (1) denying adoption on the basis of racial criteria, and (2) negligently removing him from his foster placement when it was known emotional harm would result. A. contends neither act is discretionary because the first is a violation of a legally mandated duty and the second is a disregard of an obvious hazard. A. asserts that the trial court was correct in finding that the *187 presence of child abuse definitions in the SRS manual constituted guidelines which effectively removed SRS conduct from the scope of the discretionary function exception. A. reasons that the trial court was correct in ruling, as a matter of law, that SRS was not entitled to the discretionary function exception.

Is SRS Immune From Liability Under the Discretionary Function Exception of the KTCA?
We have considered the discretionary function exception in several cases. The discretionary function exception may be the most important exception to liability in the KTCA. (The 1987 amendment to K.S.A. 75-6104[d] [Ensley 1984] added the phrase "and regardless of the level of discretion involved" and designated the discretionary function exception as subsection [e]. The 1987 amendment does not affect the instant case.)
The KTCA is an open-ended act making governmental liability the rule and immunity the exception. Nichols v. U.S.D. No. 400, 246 Kan. 93, 94, 785 P.2d 986 (1990). Under K.S.A. 75-6103(a), a governmental entity is liable for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment under the same circumstances that a private person would be liable. Collins v. Board of Douglas County Comm'rs, 249 Kan. 712, 720, 822 P.2d 1042 (1991).
K.S.A. 75-6104 states in part:
"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
....
"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."
The governmental entity bears the burden to establish immunity under one of the exceptions in K.S.A. 75-6104. Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc., 249 Kan. 348, 364, 819 P.2d 587 (1991).
In Robertson v. City of Topeka, 231 Kan. 358, 361-62, 644 P.2d 458 (1982), we determined that not all discretionary judgment is protected under the discretionary function exception and held that the determining factor was the nature and quality of the discretion exercised. "The test is whether the judgment of *188 the governmental employees is of the nature and quality which the legislature intended to put beyond judicial review." Collins, 249 Kan. at 721 (citing Robertson, 231 Kan. 358). "The more a judgment involves the making of policy the more it is of a `nature and quality' to be recognized as inappropriate for judicial review." Kansas State Bank & Tr. Co., 249 Kan. at 365. The discretionary function exception is applicable only when no clearly defined mandatory duty or guidelines exist which the government agency is required to follow. Collins, 249 Kan. at 721; Dougan v. Rossville Drainage Dist., 243 Kan. 315, 322, 757 P.2d 272 (1988).
A. argues that SRS is not entitled to immunity because it disregarded a clearly defined standard when considering race an automatically controlling factor in establishing an adoption plan for him.
In Drummond v. Fulton Cty. Dept. of Family, Etc., 563 F.2d 1200 (5th Cir.1977), white foster parents brought an action to challenge the refusal of a county adoption agency to allow them to adopt a child of mixed-race parentage. The child was placed in their home at the age of one month. Within a year, the Drummonds became attached to the child and requested permission to adopt him. The county adoption agency denied the Drummonds' request to adopt the child and removed him from the home approximately two years after the initial placement. After a hearing, the trial court determined that race was not used in an automatic fashion, but was properly directed to the best interests of the child and was not an automatic type of thing "that all blacks go to black families, all whites go to white families, and all mixed children go to black families, which would be prohibited." 563 F.2d at 1204. The Fifth Circuit Court of Appeals concluded that the difficulties inherent in interracial adoption justify the consideration of race as a relevant factor in adoption. 563 F.2d at 1205.
In concluding that race is relevant in adoption, the Drummond court noted the following factors. First, the consideration of race in child placement suggests no racial slur or stigma because it is natural for children to be raised by parents of the same ethnic background. Second, no case was cited prohibiting the consideration of race as a factor in adoption. Third, professional literature on transracial child placement stresses the importance of *189 considering racial attitudes of potential parents. The parents should be able to help the child cope with the child's problems. Fourth, religion may be considered as a factor in adoption so long as it is not an automatic factor. By analogy, race may also be considered. Finally, adoption agencies try to place a child where the child can most easily become a normal family member; thus, physical characteristics may be considered, which carry with them the permission to consider racial characteristics. 563 F.2d at 1205-06.
Chief Judge John R. Brown concurred, reasoning that race should be considered and could be the primary reason for making the decision. Chief Judge Brown observed: "Granted that society and the community should not harbor attitudes against interracial mixture, the subject of foster home placement and even adoption is the child, whose life will be affected by community values and prejudices as they exist, not what they ought to be." 563 F.2d at 1211-12. With regard to judicial review of adoption matters, Chief Judge Brown wrote:
"Lastly, it would be unwise, and to my mind, an arrogation of power for Federal Judges to voyage into the supersensitive realm of state adoption matters. To set standards as the dissent would require sounds easy. But inevitably that process involves policy choices which go to the heart of the welfare of the child, probably for the rest of the child's life. On what do we draw in making these choices? Are we, as Federal Judges, endowed with sufficient prescience to decide such delicate issues? We should remind ourselves that we do not possess the wisdom of Solomon and that Timmy's adoption is not as blissfully simple as cutting the baby in half." 563 F.2d at 1212 (Brown, C.J., concurring).
Although Chief Judge Brown's statement was not made in the context of a discussion of governmental immunity based on a discretionary function, it reflects the view that, generally, adoption placement involves the type of policy judgment inappropriate for judicial review.
In the case at bar, SRS originally planned to select a bi-racial or African-American family outside the Kansas City area who would adopt A. and D. SRS did consider A. as a black child, as stated by his social worker, Dorothy Patterson-Warren, in her deposition:
"`Q. Why was C.W. considered a Black child with eligibility for placement with BAPS then?

*190 "`A. Because his father was Black. He was visibly black. When you looked at him, you didn't have any  there was no question to question his heritage because he was obviously a Black-looking child.
"`Q. He's a very light-skinned Black child, isn't he?
"`A. Yes.
"`Q. So, a child who is half black and half white was considered a Black child as far as the Black Adoption Program working with him?
"`A. By society considered them Black.'"
In the case at bar, race was not SRS's only consideration; race was considered in A.'s best interest. SRS wanted the two brothers placed together outside the Kansas City area. The Gozas did not meet these considerations. Further, when suitable African-American or bi-racial adoptive parents could not be located, SRS referred the boys to ARENA in order to seek any adoptive parents to adopt both A. and D. Finally, the Gozas were considered and an adoption home study was ordered after SRS weighed the pros and cons of approving the Gozas for adoption. Before the adoption home study could be completed, however, the sexual manipulation incident involving A.G. was reported and investigated, which led to A.'s removal from the Goza home.
SRS did not consider race as the sole factor in the adoption decision.
A. contends his removal from the Goza home was negligent and not discretionary because: (1) SRS provided its employees with definite guidelines, and (2) a confirmed finding of abuse was made even though under the guidelines the perpetrator had to be an adult. A.G., the perpetrator, was 12 years old. A. emphasizes that he was removed even though SRS knew A. would have difficulty leaving the Goza home. A. further argues that the decision to remove him was mechanical since SRS believed abuse occurred. Consequently, A. reasons that SRS is not entitled to immunity under the totality of the circumstances.
Following the report of suspected sexual manipulation or abuse of A. by A.G., the Protective Services Unit of the SRS investigated. The Unit interviewed A., A.G., the other foster children in the home, and Mrs. Goza. A committee met and confirmed the sexual abuse allegation and decided to remove A. and the other foster children. Either removing A. or A.G., was the best way SRS could guarantee the sexual incident would not be repeated. Since A.G. was the Gozas' natural child, her removal *191 would require a court order. No court order was required to remove A.
The record on summary judgment contained no evidence that A.G. had caretaker responsibilities. However, we are not persuaded that the authority of SRS to act was limited to those situations found in its guidelines defining sexual abuse. The SRS guideline analysis advanced by A. is flawed. A. argues that the SRS manual limited the definition of abuse to acts of a parent or caretaker and, consequently, SRS was authorized to respond only to parent-caretaker situations. We cannot endorse such a restrictive concept. SRS carries a responsibility to act in the best interests of the children in its custody regardless of whether the harm is specifically defined in its guidelines.
The actions of SRS were of the discretionary nature that the legislature intended to put beyond judicial review. No specific guidelines exist to determine the proper course of action after a finding of sexual manipulation or abuse. A credible argument could be advanced that the failure to remove A. after notice of the sexual manipulation incident might subject SRS to suit for later untoward developments in A.'s personality. See Bartles v. Westchester, 76 App. Div.2d 517, 522, 429 N.Y.S.2d 906 (1980) (Action by a child who had been severely scalded by foster parents while bathing her. The child alleged the defendant county had actual notice of foster parent conduct constituting mistreatment prior to the scalding incident. An allegation against the county was based on failure to remove the child from the foster parent home upon notice of the earlier maltreatment.).
Our discretionary function exception reasoning, applied to the case at bar, is in accord with Pickett v. Washington County, 31 Or. App. 1263, 572, P.2d 1070 (1977). In that case, the minor plaintiff, Pickett, was a runaway found in a weakened condition suffering from the influence of drugs. The juvenile court ordered Pickett held in detention under the supervision of a juvenile court case worker. The case worker placed Pickett with "shelter care parents." 31 Or. App. at 1265. One of the conditions of Pickett's release to the shelter care home was that Pickett be under house arrest. The shelter care parents permitted Pickett to leave the home unattended to go horseback riding. Pickett was injured while horseback riding and sued the county, the case worker, *192 and the shelter parents. The trial court sustained defendants' demurrers to the complaint.
On appeal, the issue was whether the county and the other defendants as agents of the county were immune from liability under Oregon law which granted governmental bodies and their agents immunity for discretionary acts or functions. The Oregon Court of Appeals held that the defendants were immune from liability for acts and omissions related to the supervision, care, and custody of a ward. In reaching its decision, the Pickett court looked at two considerations: (1) the importance of the government function involved, and (2) the extent to which governmental liability might impair the exercise of that function. The Pickett court reasoned that when the government undertakes to protect the welfare of children by placing them in wardship, a more important governmental function is hard to imagine. In performing the function, the government and its agents are continually called upon to make delicate and complex judgments, often involving weighing of risks. The Pickett court stated: "Decisions of this nature rank high on the continuum of discretion and should not be subject to hindsight scrutiny by courts and juries." 31 Or. App. at 1267-68.
Our language from Beck v. Kansas Adult Authority, 241 Kan. 13, 735 P.2d 222 (1987), arising from parole board action, is appropriate:
"It is these discretionary functions of state agencies or employees which the legislature intended to place beyond the pale of tort litigation.
"The possibility of harm to third persons exists every time a prisoner convicted of violent crime is released from custody and placed back into society, yet the time always arrives when release must be effected. A decision as to the imposition of conditions, if any, must be made. Such a decision involves the exercise of great discretion. Boan had to be released, under state law. Whether conditions might have been imposed which would have prevented this catastrophe is an open question. Hindsight, always better than foresight, indicates some conditions might have had some effect. But such a decision, made now, would merely second-guess the parole authority, the agency in whose hands the legislature entrusted the discretion." 241 Kan. at 36-37.
We reverse the trial court and hold that SRS is immune from liability because the removal of A. from the foster care home by SRS was a discretionary act under K.S.A. 75-6104(e).
*193 Because of our holding on the discretionary function issue, the other issues raised by SRS need not be addressed.
Reversed.