2006 VT 92

# Nathan C. Earle v. State of Vermont

[910 A.2d 841]

No. 05-029

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 1, 2006

*Norman E. Watts* of *Watts Law Firm*, Woodstock, for Plaintiff-Appellant.

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, and *Mark J. Patane*, Assistant Attorney General, Waterbury, for Defendant-Appellee.

¶ 1. **Dooley, J.** Plaintiff Nathan Earle appeals from a summary judgment order entered in favor of defendant Vermont Department of Social and Rehabilitation Services [SRS].[1] Plaintiff claims that SRS was negligent in both placing and failing to remove or control a foster child in plaintiff's grandparents' house, and, as a result, the foster child sexually abused him. Plaintiff further claims that SRS was negligent in failing to remove him from his own household despite evidence of physical abuse by his mother. SRS challenges plaintiff's claims on numerous theories, including lack of duty and sovereign immunity. With respect to one of plaintiff's main claims, we find that SRS had no actionable duty to protect plaintiff. With respect to the others, we conclude SRS's actions are protected by sovereign immunity because they fall within the discretionary function exception to the State's waiver of sovereign immunity. We affirm.

¶ 2. We review a trial court's decision to grant summary judgment de novo, employing the same standard as the trial court. *Washington v. Pierce*, 2005 VT 125, ¶ 17, 179 Vt. 318, 895 A.2d 173. In order to prevail on a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). "[T]he party opposing summary judgment is entitled to the benefit of all reasonable doubts and inferences." *Carr v. Peerless Ins. Co.*, 168 Vt. 465, 476, 724 A.2d 454, 461 (1998).

¶ 3. The background in this case is set out in a related case that involves plaintiff's brother, *Earle v. State*, 170 Vt. 183, 743 A.2d 1101 (1999).[2] We repeat those facts:

> [Plaintiff, Mark Earle] lived in a trailer with his mother and brother on his grandparents' farm, across the street from the

---

[1] SRS is now the Vermont Department of Children and Families. We continue to refer to it by the name applicable when the events occurred.

[2] Although there is a common nucleus of facts between the two cases, the previous case involved only whether the statute of limitations foreclosed that plaintiff's action. SRS has raised that issue in this case, but the superior court did not reach it. In view of our disposition, we do not reach the statute of limitations question either.

grandparents' home. Plaintiff's mother received counseling and services from SRS to aid her in developing parenting skills. Plaintiff's grandparents provided foster care to an older boy, N.C., and N.C. was regularly in the company of plaintiff and his brother, sometimes acting as a babysitter. The parties agree that N.C. had no record of sexually abusive behavior prior to plaintiff's reports. Between December 1980 and April 1982, N.C. sexually abused plaintiff on numerous occasions.

In December 1980, plaintiff reported N.C.'s sexual abuse for the first time. He told his mother that N.C. had forced plaintiff to put N.C.'s penis in his mouth. Plaintiff was five years old. Plaintiff's mother reported the behavior to SRS. The agency confirmed the assaults, but did not remove N.C. from the grandparents' home. In April 1982, plaintiff, then seven, told his mother he was still being abused by N.C., and that he had recently been anally raped by N.C. Plaintiff's mother again reported the behavior to SRS. The agency recommended prosecution of N.C. by the Windsor County state's attorney and began seeking alternative accommodations for N.C. In September 1982, SRS removed N.C. from placement with plaintiff's grandparents.

*Id.* at 185-86, 743 A.2d at 1103.

¶ 4. Plaintiff here, Nathan Earle, is two years younger than his brother. He also reported in December 1980, when he was three years old, that he had been sexually abused by N.C. Although plaintiff now claims that N.C. sexually abused him after 1980, unlike his brother, plaintiff did not report the subsequent abuse until he filed this suit.

¶ 5. The factual record in the case at bar further develops the events after the 1980 abuse. The court explained the following undisputed facts. After the reported 1980 abuse, SRS enrolled N.C. in counseling and monitored him through periodic visits from a social worker. Then, in April 1982, when plaintiff's mother told SRS that N.C. had again molested plaintiff's brother, "SRS recommended that N.C. be prosecuted and removed him from the Earle's home in September 1982." The court found it undisputed that "[t]here is no evidence that N.C. molested [plaintiff] in 1982 or that either brother was molested after the April incident. N.C. had no further contact with Earle." N.C.'s therapist met with N.C. for about six months following the assault.

Apparently, at that time, the therapist did not consider N.C. to be a threat, and instead classified his behavior with the children as "more closely associated with normal developmental sex play[.]" The therapist ultimately concluded that he "would have had no reason to recommend that [N.C.] be removed from his foster home." SRS did not remove N.C. from the grandparents' home at that time.

¶ 6. Plaintiff claims that throughout his minority he was the victim of constant mental and physical abuse by his mother. Again, based on the undisputed summary judgment record, the superior court described the factual background. It found that SRS was working with plaintiff's mother before, during, and after the incidents with N.C. This assistance was unrelated to N.C. or to his placement in the grandparents' household, but revolved around mother's need for assistance based on trouble she was having raising plaintiff and his brother. SRS's involvement with plaintiff's mother included working with her to deal with depression and stress, providing support from a social worker, and counseling to stop her "overly physical method" of dealing with plaintiff and his brother. Additionally, SRS put plaintiff and his brother into an "at risk" day care program and intermittent therapy. Although SRS continued to monitor plaintiff's mother throughout the 1980's, her physical abuse of the children continued. These incidents of abuse included a report from the children's case worker commenting that plaintiff's brother had red marks on his face from where he had been slapped too hard by his mother and plaintiff's recollections that his mother would smack him on the head with a billy club.

¶ 7. Plaintiff's behavior continued to deteriorate, and he showed anti-social tendencies and engaged in self-destructive behavior. Eventually, when he was seventeen-years old, SRS removed him from his mother's custody and placed him in foster care. Thereafter, he spent time at the Brattleboro Retreat to address violent behavior aimed at himself and his mother. The gist of plaintiff's complaint is that his mental condition was caused by actions and failures to act on the part of SRS workers.

¶ 8. Plaintiff's complaint has twelve counts, alleging various torts, including multiple theories of negligence, intentional infliction of emotional distress, and outrageous conduct. The superior court granted judgment to SRS on all counts. For purposes of analysis, the superior court separated the claims into three groups: (1) plaintiff's claim that SRS negligently placed N.C. with plaintiff's grandparents and, as a result, is liable for the damage from N.C.'s sexual assault on plaintiff; (2) plaintiff's claims that SRS failed to protect him after the sexual assault so that N.C. continued to sexually assault him and, as a result,

that SRS is liable for damages from those assaults; and (3) plaintiff's claims that SRS failed to protect him from the physical and mental abuse by his mother and is liable for damages from that abuse. We also find this grouping helpful and analyze the claims similarly to the trial court.

▪ 9. Before we address plaintiff's specific claims, we note the context for these claims. Lawsuits against the State are barred unless the State waives its sovereign immunity. *Estate of Gage v. State*, 2005 VT 78, ¶ 4, 178 Vt. 212, 882 A.2d 1157. By the Vermont Tort Claims Act, 12 V.S.A. § 5601, the State has waived its immunity for injury to persons caused by the negligent act or omission of a state employee while acting within the scope of employment, subject to certain delineated exceptions. The operative language is contained in 12 V.S.A. § 5601(a):

> (a) The state of Vermont shall be liable for injury to persons or property or loss of life caused by the negligent or wrongful act or omission of an employee of the state while acting within the scope of employment, under the same circumstances, in the same manner and to the same extent as a private person would be liable to the claimant . . . .

*Id.* As we explained in *Denis Bail Bonds, Inc. v. State*, the waiver of § 5601(a) is limited to circumstances where there is a private analog for the theory of liability advanced by the plaintiff so as not to "'visit the Government with novel and unprecedented liabilities.'" 159 Vt. 481, 486, 622 A.2d 495, 498 (1993) (quoting and citing *Feres v. United States*, 340 U.S. 135, 142 (1950)). In a negligence case, the first question in applying the statute is whether the State owes the plaintiff a duty of care under the circumstances. See *id.* at 487, 622 A.2d at 498-99. Whether a duty of care exists is a question of law for the court. *Id.* at 487, 622 A.2d at 499. In determining whether a governmental body has undertaken a duty of care towards a specific individual, as distinguished from its duty to the public at large, the court considers four factors: (1) whether an ordinance or statute sets forth mandatory acts for the protection of a particular class of persons; (2) whether the government has actual knowledge that particular persons within that class are in danger; (3) whether there has been reliance by those persons on the government's representations or conduct; and (4) whether the government's failure to use due care would increase the

risk of harm beyond its present potential. *Sabia v. State*, 164 Vt. 293, 299, 669 A.2d 1187, 1191 (1995).

¶ 10. Two of our prior decisions are particularly important in addressing the question of whether SRS had a duty to address the harm alleged in each of plaintiff's claims and the related issue of whether there is a private analog for such a duty. As such, we discuss those cases in depth.

¶ 11. The first of these precedents is *Sabia v. State*, 164 Vt. at 297, 669 A.2d at 1190-91, in which two sisters alleged that they were sexually assaulted by their stepfather and that SRS failed to take any action to protect them after they reported the abuse to SRS. Applying the four-part test, this Court found that each of the four factors weighed heavily in favor of the finding that SRS owed the sisters a duty. *Id.* at 299, 669 A.2d at 1191. As to the first factor, we concluded statutory law provides that:

> (1) SRS *shall* cause an investigation to commence within seventy-two hours after receipt of a report of child abuse, 33 V.S.A. § 4915(a) . . . (2) the investigation *shall* include a visit to the child's home and an interview with, or observation of, the child, and shall seek to determine, among other things, the identity of the abuser and the immediate and long-term risk if the child remains in the existing home, *id.* § 4915(b) . . . and (3) if the investigation produces evidence of abuse or neglect, SRS *shall* cause *assistance* to be provided to the child and his family in accordance with a written plan of treatment. *Id.* § 4915(c).

*Id.* at 299, 669 A.2d at 1191-92 (internal quotations omitted). We went on to note that the stated purposes of the provisions requiring SRS to investigate abuse reports and render appropriate services are "to protect children whose health and welfare may be adversely affected through abuse or neglect, to strengthen the family and make the home safe for children, and to provide a temporary or permanent nurturing and safe environment for children when necessary." *Id.* at 299, 669 A.2d at 1192 (citing and quoting 33 V.S.A. § 4911) (internal quotations omitted). We thus held it "beyond dispute" that the statute created a duty on the part of SRS "to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs." *Id.* (citing Restatement (Second) of Torts § 286 (1965) (court may adopt as standard of conduct requirements of statute whose purpose is to protect class of persons that includes plaintiff from type of harm

suffered by plaintiff); and *Cronin v. State,* 148 Vt. 252, 255, 531 A.2d 929, 931 (1987) (no private cause of action available under state regulation not promulgated for plaintiff's special benefit)). We also concluded that the other three factors of the standard supported the finding of duty. The pleadings in *Sabia* alleged that SRS had knowledge of the danger, that plaintiffs relied upon SRS's promises of action, and that SRS's inaction increased the risk of harm. See *id.* at 299-300, 669 A.2d at 1192; see also *Sabia v. Neville,* 165 Vt. 515, 687 A.2d 469 (1996) (companion case that explores extent of SRS's knowledge and commitment to act).

¶ 12. The second important precedent relevant to this case is *Sorge v. State,* 171 Vt. 171, 762 A.2d 816 (2000), in which the plaintiff was injured when assaulted by a juvenile in SRS custody who had been placed temporarily back with his mother. The plaintiff alleged that SRS failed to adequately supervise and control the juvenile, who had a history of "violent, assaultive and delinquent behavior." *Id.* at 173, 762 A.2d at 817-18. In this circumstance we found no duty of care, noting at the outset that no statute provided "a specific duty of care with respect to plaintiffs individually, as distinct from the duty the State owes to them as members of the general public," and that the presence of a specific statutory duty had been critical in *Sabia. Sorge,* 171 Vt. at 174-75, 762 A.2d at 819. Moreover, we held that juvenile programs dealing with persons committed to SRS custody are intended to "rehabilitate conduct rather than control it." *Id.* at 177, 762 A.2d at 820-21. Thus, we concluded that imposing tort liability in these circumstances "would erode the public policy of rehabilitation of juveniles through reunification with their families and the public," *id.* at 179, 762 A.2d at 822, and that the "Legislature has weighed the public interest in safety against the public policy favoring rehabilitation of juveniles through reunification with their families and the community, and has struck a balance in favor of rehabilitation," *id.* In conclusion, we declined to impose a duty of care on SRS "that would disturb the delicate balance the Legislature has crafted between the best interests of children and the broader interests of public safety." *Id.* at 180, 762 A.2d at 823.

I. Negligent Placement of N.C.

¶ 13. With this background in mind, we return to the three groups of claims in plaintiff's complaint. As the superior court held, *Sorge* controls the first group of claims involving the allegations that SRS is liable for the 1980 sexual assault on plaintiff because it placed

the perpetrator — N.C., a child in its custody — in the home of plaintiff's grandparents and failed to control him while he was there. Unlike the situation in *Sorge*, there is no allegation here that SRS knew that N.C. was dangerous or presented a known risk of sexually assaulting a young child. Thus, SRS had no duty to plaintiff to avoid placing N.C. in the grandparents' home or to control him while he was there.

## II. Failure to Control or Remove N.C.

¶ 14. Once the first sexual assault was reported to SRS, the agency's duty to an abused child arose. *Sabia*, 164 Vt. at 299-300, 669 A.2d at 1191-92. As such, the question of whether SRS had a duty with respect to any later sexual assault by N.C., the subject of the second group of claims, falls within the ambit of *Sabia*, *id.*, and not *Sorge*.

¶ 15. SRS argues, however, that *Sabia* does not control this case because: (1) the statute that forms the basis for the duty found in *Sabia* was enacted after the alleged sexual assaults; (2) SRS was not notified of N.C.'s alleged subsequent sexual assaults on plaintiff after the first assault; and (3) the private analogs found in *Sabia* necessary to sustain a tort claim against the State are inapplicable. The superior court rejected the first argument because a predecessor statute provided similar protection to the statutes on which we relied in *Sabia*. We agree with the court's analysis.

■ ¶ 16. The applicable duty to report child abuse, and SRS's duty to act on such reports, was created by the Legislature in 1974 by the statutes regarding the physical abuse of children, 13 V.S.A. §§ 1351-1356. 1973, No. 152 (Adj. Sess.), §§ 2-3; 1973, No. 237 (Adj. Sess.), §§ 1-5. The statutes were amended in 1976 to specifically include sexual abuse within the definition of abuse. 1975, No. 200 (Adj. Sess.), §§ 1-4. The main SRS duty required by the earlier statute was the same as *Sabia* later found was required by 33 V.S.A. § 4915(c),[3] that is, a requirement that SRS investigate reports of abuse, and if the investigation produces evidence of abuse, to "cause assistance to be provided to the child and his family in accordance with a written plan of treatment." 13 V.S.A. § 1355(a), as amended by 1973, No. 237 (Adj. Sess.),

---

[3] The statute relied upon in *Sabia*, 33 V.S.A. § 4915, was adopted in 1982 by 1981, No. 207 (Adj. Sess.), § 1, effective April 25, 1982. For purposes of analysis, we assume that all of N.C.'s sexual abuse occurred prior to April 25, 1982. Because we conclude that SRS's duty under the earlier statutes was the same as its duty under § 4915, this assumption does not affect the result of our decision.

§ 5. The legislative purpose for the duties was also the same as that found in *Sabia*, that is, to "protect children whose health and welfare may be adversely affected through abuse or neglect; to strengthen the family and to make the home safe for children," and "to provide a temporary or permanent nurturing and safe environment for children when necessary." 13 V.S.A. § 1351, as amended by 1973, No. 237 (Adj. Sess.), § 1. While the duties created in the 1970's lacked some of the details that later appeared in the statutory scheme, the essential obligation on SRS to investigate reports of child abuse and render assistance was created. Thus, our determinative conclusion in *Sabia* that "it is beyond dispute that the relevant statutory provisions create a duty on the part of SRS to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs," 164 Vt. at 299, 669 A.2d at 1192, applies equally under the earlier statutes applicable here, even without the directory language. Accordingly, we hold that *Sabia*'s finding of an applicable duty on the part of SRS applies to plaintiff's second group of claims that arise out of N.C.'s sexual abuse of plaintiff after the initial reported abusive act.

¶ 17. The superior court also rejected SRS's second argument that no duty arose because the abuse was not reported after the 1980 incident. The court decided that "it was not unreasonable for SRS to extrapolate from its knowledge about [plaintiff's] ... brother to consider the danger posed to [plaintiff]." We agree with this analysis. We rejected a similar argument from SRS in *Sabia v. Neville*, 165 Vt. at 524, 687 A.2d at 475:

> We also do not believe that we can neatly separate out the information about [plaintiff's sister] from the information about plaintiff. If LaPlant sexually abused [plaintiff's sister], it would not be unexpected that LaPlant would sexually abuse plaintiff. Thus, any duty [the SRS worker] had to investigate the allegation with respect to [plaintiff's sister], and provide assistance, may have included an accompanying obligation to investigate whether LaPlant was also sexually abusing plaintiff.

That duty was even stronger where, as here, N.C. had abused plaintiff in the past, as well as abused plaintiff's brother.

¶ 18. We now address SRS's third argument, that no private analog exists to find the State liable for the alleged torts. On this point, the superior court sided with SRS.

¶ 19. *Sabia* found a number of private analogs for plaintiffs' failure-to-assist claims after noting that plaintiffs' claim was that "SRS failed to provide any assistance whatsoever." 164 Vt. at 301, 669 A.2d at 1193. Thus, we phrased the private analog question as whether a private analog exists "for an action based on SRS's failure to perform its statutory duty to assist children seeking protection from reported and substantiated abuse[.]" *Id.* We found an analog under Restatement (Second) of Torts § 323 (1965) in an action against one who gratuitously undertakes services necessary to protect another, but performs them negligently, where the negligence increases the risk of harm and the harm results from the other's reliance on the undertaking. *Id.* at 302-03, 669 A.2d at 1194. We also found an analog under Vermont's good samaritan statute, 12 V.S.A. § 519, pursuant to the Restatement (Second) of Torts § 324, referencing "a duty of care upon those who take charge of helpless persons," and Restatement (Second) of Torts § 315(b), articulating a duty to control the conduct of third parties to prevent them from causing harm to others in certain circumstances we found to be analogous. *Id.* at 304-05, 669 A.2d at 1194-95.

¶ 20. SRS argues that none of the tort theories against private individuals that we found applicable in *Sabia* apply in this case because of a fundamental difference between the two cases. Here, SRS claims its workers did provide plaintiff assistance, thereby fully discharging their statutory duty. Thus, unlike *Sabia*, this case is about the *adequacy* of SRS's assistance, and SRS asserts that none of the private analogs accepted in *Sabia* apply to such a claim. Moreover, SRS argues that plaintiff's central position is that SRS should have removed N.C. from the grandparents' home to separate them, and we specifically stated in *LaShay v. Dep't of Soc. & Rehabilitation Servs.*, 160 Vt. 60, 69, 625 A.2d 224, 229 (1993), that there is no private analog for a suit based on failure to remove a juvenile from a home. See *id.* (stating in passing that "only the state can remove [a child] from the custody of his parents and legally grant custody to the Commissioner of SRS").

¶ 21. Although these issues about the reach of *Sabia*'s analysis of a private analog are important, they are better resolved through another aspect of the Vermont Tort Claims Act that provides an exception to the waiver of sovereign immunity for discretionary functions. The superior court also held that this exception applies in this case. Because the application of that exception fully supports the superior court's judgment, we leave undecided SRS's remaining arguments on private analog and turn to that exception.

¶ 22. The discretionary function exception provides that the waiver of immunity does not extend to acts or omissions of state employees that are "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." 12 V.S.A. § 5601(e)(1). The purpose of the discretionary function exception is to assure "that the courts do not invade the province of coordinate branches of government by passing judgment on legislative or administrative policy decisions through tort law." *Sabia*, 164 Vt. at 307, 669 A.2d at 1196-97; accord *Searles v. Agency of Transp.*, 171 Vt. 562, 563, 762 A.2d 812, 814 (2000) (mem.) ("[T]he purpose of the exception is to prevent judicial second guessing of legislative or administrative policy . . . ."). A discretionary function is an act on the part of the state or a state employee that requires the exercise of judgment in its performance, or, in the alternative, a situation "where there is no specifically dictated course of action for the employee to follow." *Amy's Enterprises v. Sorrell*, 174 Vt. 623, 625, 817 A.2d 612, 617 (2002) (mem.).

¶ 23. In *Searles*, 171 Vt. at 563, 762 A.2d at 813-14, we adopted the two-part test for determining whether a plaintiff's claims are barred by the discretionary function exception to tort liability, a test we derived from *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). Under this test, a court must first determine whether the act or omission challenged by the plaintiff is one that involves "an element of judgment or choice" or whether a "statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Searles*, 171 Vt. at 563, 762 A.2d at 814 (quoting and citing *Gaubert*, 499 U.S. at 322). If the court concludes that the act involves judgment or choice, it must then determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Since the purpose of the discretionary function exemption is to prevent courts from passing judgment on legislative or administrative policy decisions through the use of tort law, the exception "protects only governmental actions and decisions based on considerations of public policy." *Lane v. State*, 174 Vt. 219, 224, 811 A.2d 190, 194 (2002) (internal citations omitted). It is, however, presumed that when a government agent is authorized to exercise discretion, the agent's acts are grounded in policy when exercising that discretion. *Estate of Gage v. State*, 2005 VT 78, ¶ 5. Thus, "to survive a motion for summary

judgment, a plaintiff must allege facts sufficient to overcome the presumption that the discretion involved policy considerations." *Id.*

¶ 24. SRS did act in this case in response to the report of sexual abuse of plaintiff. As the trial court found from the undisputed facts in the summary judgment record: "[SRS] enrolled N.C. in counseling; it monitored N.C. through a social worker; it enrolled [plaintiff's] brother, and later [plaintiff], in 'at risk' day care and therapy; and it worked with [plaintiff's] grandparents to deal with N.C." The counseling therapist did not recommend removing N.C. from the grandparents' home because the therapist viewed the incident as associated with developmental sex play. He reported that N.C. was ashamed of the act, and that the sexual abuse would not occur again. In addition, both the grandparents and plaintiff's mother were aware of the earlier incident and were acting to protect plaintiff.

¶ 25. As the trial court noted, there are no definitive ministerial standards that SRS workers apply in response to a sexual abuse report. Cf. *Gloria G. v. State Dep't of Soc. & Rehabilitation Servs.*, 833 P.2d 979, 987 (Kan. 1992) (relying on the absence of specific guidelines to respond to sexual abuse accusation to hold that discretionary function exception applies). The workers are highly educated professionals that must use judgment in determining the appropriate intervention. Here, the workers relied upon the judgment of a mental health professional in developing the proper assistance. Moreover, as was present in *Sorge*, the SRS workers faced the challenge of rehabilitating one juvenile, while protecting others. The placement of difficult-to-manage juveniles with foster families necessarily involves some risk for the foster family and those close to it. As the superior court noted, plaintiff's response is to rely on competing professional analyses of what the SRS workers should have done in these circumstances, rather than on ministerial requirements; this response highlights the inherently judgmental aspects in abuse report responses. There is no question that this case meets the first prong of the discretionary function test because the response of the SRS workers to the report of sexual abuse of plaintiff involved an "element of judgment." *Searles*, 171 Vt. at 563, 762 A.2d at 814.

¶ 26. We turn to the second prong of the discretionary function test, where courts must conclude whether the judgment at issue is of the kind the Legislature intended to insulate from tort liability. *Id.* We held in *Estate of Gage* that the determination not to extend a guard rail on the interstate highway "involved precisely the kind of policy judgments — the weighing of risks, financial costs, and environmental

and aesthetic impacts — that the discretionary-function exception was designed to protect." 2005 VT 78, ¶ 7. The argument for applying the discretionary function exception is equally apt in this case. As the Supreme Court of Minnesota found in a case where a county child protection agency failed to remove a child from the home:

> In making this placement decision, the County's social worker was required to weigh the competing governmental policies of protecting the child from danger within the family and keeping the family together, a decision involving profound social considerations and, consequently, a decision at the policy-making level protected by discretionary function immunity.

*Olson v. Ramsey County*, 509 N.W.2d 368, 371 (Minn. 1993); accord *Thorne v. Hennepin County*, 1997 WL 714705, at *5 (Minn. Ct. App. 1997) ("Placement authorities must consider the public interest in providing the best possible care for the child, the cost of the care, and the availability of services."). Other courts have reached the same result under comparable discretionary function exceptions to sovereign immunity waiver legislation. See, e.g., *Gloria G.*, 833 P.2d at 987-88; *Foster v. Washoe County*, 964 P.2d 788, 792 (Nev. 1998). We hold that the child protection decisions made in this case in response to allegations of abuse and for children in SRS custody fall squarely within the intended scope of the discretionary function exception. Because these decisions meet both prongs of the discretionary function exception test, they are protected by sovereign immunity from tort litigation against the child protection agency. The superior court was correct in granting summary judgment to SRS on the second group of claims — those involving N.C.'s sexual assaults on plaintiff after the first reported assault — under the discretionary function exception to state tort liability.

### III. Failure to Protect Plaintiff from Abuse by His Mother

¶ 27. The claims in the third group are doctrinally similar to those in the second group. Plaintiff's complaint alleges: "SRS was also aware that plaintiff's mother was emotionally unstable and regularly abuse[d] him physically and emotionally. SRS failed to remove plaintiff from the residence and he was continually subjected to his mother's abuse throughout his childhood. As a result of SRS's negligence, plaintiff was traumatized for life." Until plaintiff was seventeen-years old, he remained in his mother's custody, and no formal juvenile proceeding

was initiated. Because SRS received reports of corporal punishment of plaintiff, however, it monitored plaintiff's home environment and extended services to plaintiff's mother and to plaintiff under a plan of assistance. It provided intermittent therapy to plaintiff's mother and to plaintiff.

¶ 28. As with the claims in the second group considered above, the gravamen of plaintiff's complaint is not that SRS failed to act at all, but instead that its actions were inadequate. Specifically, plaintiff argues that SRS should have initiated a CHINS petition and sought to remove plaintiff from his mother's custody based on the reports of physical abuse it received. As with the claims in the second group, SRS argues that plaintiff's claims are not governed by *Sabia*, that there is no private analog for defendant's action or omission, and that SRS's actions or omissions are protected by the discretionary function exception. The superior court held that there is no private analog for the claim that SRS should have removed plaintiff from his mother's custody much earlier and that the failure to take other actions is protected by the discretionary function exception.

¶ 29. For the reasons we have stated above, we agree that the State has not waived its sovereign immunity for these claims because the discretionary function exception applies. In addition to our discussion and conclusion above, we note that the decision of whether to initiate CHINS proceedings or to take a child from a parent's custody is an action that SRS can only recommend to the local state's attorney. For these reasons and those stated above with respect to the second group of claims, we hold that the discretionary function exception applies and the superior court correctly granted summary judgment to SRS on that basis.

*Affirmed.*

¶ 30. **Johnson, J.,** concurring. I concur in the result and much of the reasoning of the majority opinion in this case. I write separately only to express my view of the distinction between the agency actions in this case, where the discretionary function exception applies, and those in *Sabia v. State*, 164 Vt. 293, 307-08, 669 A.2d 1187, 1196-97 (1995), where we did not apply the exception. The majority characterizes the difference between *Sabia* and this case as the difference between the agency's alleged failure to respond at all to the plaintiffs' claims of abuse in *Sabia* and its alleged failure to provide an *adequate* response to plaintiff's claims here. *Ante*, ¶¶ 20, 28. I believe this distinction is somewhat of an oversimplification. There may be circumstances under

which the agency responds to a claim of abuse, but its response fails to comply with the mandatory duties established by 33 V.S.A. § 4915, including the duty to promptly investigate claims of abuse, 33 V.S.A. § 4915(a), and the duty to conduct such investigations according to the requirements of § 4915(b). The agency cannot claim immunity under the discretionary function exception by simply taking some action, no matter how token, in response to a report of abuse; its response must be sufficient to satisfy the mandatory requirements of the statute. The response of SRS was sufficient to meet that standard in this case, so I join in the conclusion reached by the majority. I am authorized to state that Justice Skoglund joins in this concurrence.