NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 40

No. 2018-275

| | |
|---|---|
| James Ingerson | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Andrew Pallito, Commissioner, | March Term, 2019 |
| Vermont Department of Corrections and Leanne Salls | |

Robert P. Gerety, Jr., J.

Daniel D. McCabe of Adler & McCabe, PLC, St. Johnsbury, for Plaintiff-Appellant.

Thomas J. Donovan, Jr., Attorney General, and David R. Groff, Assistant Attorney General, Montpelier, for Defendant-Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **EATON, J.** Plaintiff-appellant, James Ingerson, sued the Department of Corrections (DOC) for negligence in investigating allegations that plaintiff was being sexually exploited by a DOC employee while he was an inmate at a DOC correctional facility. The trial court granted summary judgment to the State, holding that plaintiff's claim was barred by the discretionary function exception to the Vermont Tort Claims Act (VTCA), 12 V.S.A. § 5601(e)(1). Plaintiff appealed the summary judgment ruling to this Court. We affirm.

¶ 2. The undisputed facts taken in the light most favorable to plaintiff are as follows. During the spring of 2011, plaintiff was incarcerated and housed in Echo Unit at the Southeast State Correctional Facility (SESCF). Leanne Salls worked as a correctional officer (CO) at the

same facility and was assigned to one or two shifts per week in the Echo Unit. Under Vermont law, sexual activity between an inmate and a supervising officer, such as a CO, is illegal and constitutes criminal conduct by the supervising officer. 13 V.S.A. § 3257 (criminalizing sexual exploitation of inmates). Both parties agree that in April or May 2011, Salls began sexually exploiting plaintiff.[1] Salls and plaintiff state that sexual intercourse occurred several times in the staff bathroom of Echo Unit. Plaintiff confirms that he knew Salls's actions violated prison rules, but he never reported any inappropriate conduct to DOC employees or officials.

¶ 3. In late May 2011, DOC supervisors at the facility began receiving reports of boundary violations regarding plaintiff and Salls, including reports that plaintiff and Salls spent an inappropriate amount of time talking to each other and sitting together at meals. In response to the May reports, two supervisors met with Salls on June 3, 2011. During the meeting, Salls was reminded of work rules prohibiting inappropriate conduct, and she denied any inappropriate conduct was occurring with plaintiff. Supervisors instructed Salls to avoid excessive contact with plaintiff. From June 3 until June 12, 2011, supervisors continued to observe inappropriate interactions between Salls and plaintiff, and they referred the matter to the Department of Human Resources (DHR) for investigation. Specifically, the reports, which were documented in emails

---

[1] Although plaintiff testified that he consented to sexual activity with Salls, we reaffirm that under Vermont law and federal regulations the inherent power imbalance between supervising officers and incarcerated individuals renders consensual sexual activity impossible in carceral settings. See 13 V.S.A. § 3257 (criminalizing sexual exploitation of inmates); see also 34 U.S.C. §§ 30301-30309 (outlining federal Prison Rape Elimination Act (PREA)); 28 C.F.R. §§ 115.6-115.93 (defining sexual contact perpetrated by staff against incarcerated individual "with or without [inmate's] consent" as "sexual abuse" and outlining "zero tolerance [policy] toward all forms of sexual abuse and sexual harassment"). A supervising officer engaging in sexual activity with an incarcerated individual is criminal conduct under our laws.

In this case, Salls was the aggressor and plaintiff was the target of sexual exploitation. As a result of her actions, Salls pleaded guilty to a misdemeanor. Accordingly, to the extent that the court's undisputed facts refer to Salls's inappropriate sexual activity with plaintiff as a sexual or romantic "relationship," we refer to these acts as sexual misconduct, abuse, or exploitation.

2

between the staff, indicated that Salls volunteered to work overtime but said she would only do so if she could work in Echo Unit, and that while Salls was working the overtime shift in Echo Unit, she and plaintiff spent a significant amount of time together—either standing at Salls's desk after lock in, which is a rule violation, or in unmonitored areas in the facility cameras' blind spots.

¶ 4.     In response to these reports, DHR notified Salls to appear for an interview on June 21.   During the interview with DHR, Salls denied that she was sexually exploiting plaintiff; she later admitted this was a lie.  DHR investigators also interviewed plaintiff on June 21.  Plaintiff told the investigators, "There's no sexual relationship whatsoever going on between me and Ms. Salls."  Plaintiff later acknowledged that he lied several times during the interview in a deliberate effort to hide the ongoing sexual interactions between Salls and him, stating that he "tried to hide it" and that he "lied to everybody during this whole process."  Plaintiff does not dispute that he hid Salls's misconduct from DOC staff and that Salls did not ask him to do so.

¶ 5.     After the June 21 interviews, supervisors continued to monitor contact between plaintiff and Salls.  Email reports from facility staff between June 22 and September 4 indicated additional concerns and boundary violations, including reports of Salls eating in the dining hall with plaintiff, reports of Salls spending too much time in the cells, and reports about Salls's strange behavior with plaintiff in the recreation room—spending time alone with him in unmonitored areas.  At one point, DOC supervisors attempted to shift one of the facility's cameras to monitor the SESCF staff.  However, the new positioning offended staff members due to the camera's angle, and it was returned to its original setting before it yielded any investigative results.

¶ 6.     On September 5, 2011, an inmate alleged that he witnessed Salls make inappropriate sexual contact with plaintiff during a softball game at the facility.  This was the first written report that specifically alleged direct sexual conduct by Salls against plaintiff—the previous reports indicated suspicions of boundary violations but did not include reports of sexual contact.  The next day, Salls was assigned to work at the facility's control post, a position that does

3

not involve direct contact with inmates. Salls did not work at the facility on September 7 or 8 because those were her regularly scheduled days off. From September 6 through September 8, facility staff investigated the September 5 allegations of sexual misconduct. On September 9 when Salls reported to the facility, she was temporarily relieved from duty pending an investigation into the allegations. Salls was sent home and did not return to work at SESCF.

¶ 7. Subsequently in August 2014, plaintiff filed suit seeking monetary damages alleging that Salls sexually exploited him and DOC failed to keep him safe from sexual exploitation by properly supervising Salls. DOC moved for summary judgment, arguing in part that DOC was immune from suit. The trial court concluded that, based on the undisputed facts, the discretionary function exception in the VTCA applied to the investigation and DOC was immune from suit. The court granted DOC's motion for summary judgment and dismissed plaintiff's claim against DOC. Plaintiff now appeals the court's ruling to this Court.

¶ 8. On appeal, plaintiff primarily argues that the discretionary function exception does not apply to DOC's investigation because DOC failed to establish procedures for investigating allegations of sexual misconduct pursuant to its sexual harassment policy, Policy 126. Plaintiff further argues that even if the discretionary function exception does apply, DOC waived its sovereign immunity because: (1) DOC failed to provide an adequate response to plaintiff's claims by not separating Salls and plaintiff while investigating the boundary-violation reports; and (2) DOC was ministerially negligent "when it made incorrect decisions" during the investigation, specifically regarding DOC's repositioning of facility cameras and misinterpreting Salls's employment contract.[2] The State contends the court was correct and the discretionary function

---

[2] The court did not rule on plaintiff's claim against Salls when granting summary judgment in favor of the State. The case against Salls proceeded, resulting in a final judgment against her in July 2018, at which point this matter became ripe for appeal. Plaintiff does not challenge the judgment entered in his behalf against Salls; this appeal focuses entirely on whether the court appropriately granted summary judgment in favor of DOC, dismissing DOC as co-defendant in the matter.

exception applies because, in the absence of directives or standards requiring DOC to take specific steps, DOC reasonably exercised its discretion in investigating the allegations of sexual exploitation. Based on the undisputed facts before the court, the discretionary function exception applied to DOC's investigation in this case; we affirm the court's grant of summary judgment in favor of the State.

¶ 9. We review an award of summary judgment de novo. "Summary judgment is appropriate if, with facts taken as alleged by the nonmoving party and reasonable doubts and inferences resolved in favor of the nonmoving party, there is no genuine issue as to any material fact and any party is entitled to judgment as a matter of law." Kennery v. State, 2011 VT 121, ¶ 10, 191 Vt. 44, 38 A.3d 35 (quotations omitted); V.R.C.P. 56(a).

I. The Discretionary Function Exception Applies to DOC's Investigation

¶ 10. First, we consider whether sovereign immunity, specifically the discretionary function exception contained in the VTCA, shielded DOC's investigation.

¶ 11. It has long been established that "[l]awsuits against the State are barred unless the State waives its sovereign immunity." Lane v. State, 174 Vt. 219, 222, 811 A.2d 190, 193 (2002). Under the VTCA, the State has waived immunity to the extent that a private analog exists and consented to suit when an injury is "caused by the negligent or wrongful act or omission of an employee of the State while acting within the scope of employment." 12 V.S.A. § 5601(a); see Searles v. Agency of Transp., 171 Vt. 562, 563, 762 A.2d 812, 813-14 (2000) (mem.) (outlining discretionary function exception). There are exceptions to this liability where the State has expressly elected to retain its sovereign immunity. Relevant to this case, the State has specifically retained immunity for acts or omissions by state employees "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." 12 V.S.A. § 5601(e)(1). This is referred to as the "discretionary function exception." "The purpose of the discretionary function exception is to assure that the

5

courts do not invade the province of coordinate branches of government by passing judgment on legislative or administrative policy decisions through tort law." Earle v. State, 2006 VT 92, ¶ 22, 180 Vt. 284, 910 A.2d 841 (quotation omitted).

¶ 12.    The exception does not apply to all State action; it shields only acts or omissions by state employees that qualify as "discretionary functions."  Discretionary functions are acts that require the exercise of judgment in a situation "where there is no specifically dictated course of action for the employee to follow."  Id. (quotation omitted).  This Court has adopted the two-part test outlined in United States v. Gaubert, 499 U.S. 315, 322-25 (1991), to evaluate whether a State's act or omission qualifies as a discretionary function.  Searles, 171 Vt. at 563-64, 762 A.2d at 813-14.

¶ 13.    Under the first prong of the test, the court must determine whether a statute, regulation, or policy mandates certain acts, or whether performance of a duty involves an element of judgment or choice.  "Generally, statutory duties that involve a predictable standard for decision making are ministerial, and thus subject to tort suits."  Sabia v. State, 164 Vt. 293, 307, 669 A.2d 1187, 1197 (1995).  "If a statute or regulation or policy specifically prescribes a course of action for an employee to follow, then the discretion requirement is not met."  Lane, 174 Vt. at 224, 811 A.2d at 194.  Thus, acts that are ministerial and clearly prescribed by policy are not covered by the discretionary function exception.  However, if there are no clear mandates guiding state action and "the court determines that the act involved an element of judgment or choice, it must then decide . . . the second prong."  Id.

¶ 14.    The second prong of the test directs the court to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield"—policy-related judgments.  Id. (quotation omitted).  The discretionary function exception was intended to protect governmental actions and decisions based on public policy considerations; decisions not related to public policy are not immune from suit.  Kennery, 2011 VT 121, ¶ 32.  However, it is presumed

6

that when a government agent is authorized to exercise discretion, the agent's "acts are grounded in policy when exercising that discretion." Id. (quotation and alteration omitted). "[T]o survive a motion for summary judgment, a plaintiff must allege facts sufficient to overcome the presumption that the discretion involved policy considerations." Earle, 2006 VT 92, ¶ 23 (quotation omitted). "The analysis focuses on whether the actions taken by the government employee are susceptible to policy analysis, not on an employee's subjective intent in exercising the discretion conferred by regulation." Kennery, 2011 VT 121, ¶ 32 (quotation and alteration omitted). If state action "involves negligence unrelated to any plausible policy objectives," then the second prong of the test is not satisfied, and the discretionary function exception does not apply. Coulthurst v. United States, 214 F.3d 106, 111 (2d Cir. 2000); see also Kennery, 2011 VT 121, ¶ 36 (holding that state troopers' welfare check at wrong address was not covered by discretionary function exception because "[t]he discretionary activity at issue was to apply the information given the officers to search the right house" and there was "no public policy analysis in this activity").

¶ 15.   If both prongs of the test are satisfied, then the discretionary function exception applies, and sovereign immunity bars suit against the State. Yet, the protection offered to the State under the discretionary function exception is not boundless. Courts have noted, "time and again, that it is impossible to define the precise contours of the exception." Lively v. United States, 870 F.2d 296, 299 (5th Cir. 1989) (citing United States v. Varig Airlines, 467 U.S. 797, 813 (1984) (additional citations omitted)). Although the parameters of the exception are not altogether clear, this Court has held that for the discretionary function exception to apply, the State must act to discharge its duty. See Sabia, 164 Vt. at 307-08, 669 A.2d at 1197 (holding that judgment on the pleadings in favor of State based on discretionary function exception would be inappropriate where State failed to act on reports of child abuse). "[O]nce the government makes a policy decision protected by the discretionary function exception, it must proceed with due care in the implementation of that decision." Caplan v. United States, 877 F.2d 1314, 1316 (6th Cir. 1989).

7

This due-care standard applies specifically to implementing acts that are ministerial in nature and leave "no room for choice or judgment." Gaubert, 499 U.S. at 324; see, e.g., Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955) (explaining that once Coast Guard undertook to operate lighthouse, "it was obligated to use due care" to ensure light was in working order).

¶ 16. In contrast, discretionary acts furthering a protected policy decision are shielded by the exception when there is a "range of discretion to exercise in deciding how to carry out the . . . activity." Gaubert, 499 U.S. at 325. These "[a]ctions taken in furtherance of the program" are protected, "even if those particular actions were negligent." Id. at 323; see also 12 V.S.A. § 5601(e)(1) (explaining that discretionary function exception applies to "[a]ny claim based upon an act or omission of an employee of the State . . . based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused" (emphasis added)); see also 28 U.S.C. § 2680(a) (outlining same protection with respect to federal government employees).

¶ 17. In sum, while the discretionary function exception shields the State from liability for administrative and policymaking decisions, it will not excuse the State from liability for failure to act when required or for failure to use reasonable care when executing ministerial tasks in furtherance of a discretionary undertaking. Once the government makes a policy decision protected by the exception, nondiscretionary ministerial acts executing that decision must be conducted with due care and discretionary acts for that same purpose are protected by the exception so long as they involve the exercise of judgment.

¶ 18. Relevant to our analysis here, this Court has recognized that the discretionary function exception often applies in the context of state investigations and in carceral settings. We have explained that "[a]s it requires substantial judgment in terms of means and manner, the act of investigation is a discretionary one." Amy's Enters. v. Sorrell, 174 Vt. 623, 625, 817 A.2d 612, 617 (2002) (mem.); Levinsky v. Diamond, 151 Vt. 178, 191, 559 A.2d 1073, 1082 (1989) (holding

publicity decisions made by assistant attorneys general in course of investigation were discretionary), overruled on other grounds by Muzzy v. State, 155 Vt. 279, 583 A.2d 82 (1990). Regarding investigating allegations of sexual abuse specifically, in Earle this Court found summary judgment in favor of the State was appropriate when no "definitive ministerial standards" existed and state employees were required to exercise judgment in response to a sexual abuse report made by a foster child. 2006 VT 92, ¶ 25. We held that investigating allegations of sexual abuse in that case required state employees to "weigh the competing governmental policies," and therefore the "decisions made . . . in response to allegations of abuse . . . [fell] squarely within the intended scope of the discretionary function exception." Id. ¶ 26.

¶ 19. We have also recognized the broad discretionary authority afforded to prison officials. Conway v. Cumming, 161 Vt. 113, 115, 636 A.2d 735, 736 (1993) (recognizing "necessarily broad discretionary authority of prison officials over prison administration"); see also Parker v. Gorczyk, 170 Vt. 263, 277, 744 A.2d 410, 420 (1999) (explaining that decisions regarding classification of inmates in administration of prisons "are peculiarly within the province and professional expertise of prison officials, and courts should defer to their expert judgment in such matters"). Regarding the applicability of the discretionary function exception in carceral settings, we recently explained that decisions made when exercising judgment over the management of a correctional facility may fall within the discretionary function exception, but nondiscretionary duties that are "purely ministerial act[s]" do not. Wool v. Menard, 2018 VT 23, ¶ 15, __ Vt. __, 185 A.3d 577 (quotation omitted) (holding that discretionary function exception was not applicable to DOC's nondiscretionary act of awarding contracts for telephone services).

¶ 20. In this case, DOC exercised its discretion when it investigated the allegations of sexual exploitation at issue without definitive ministerial standards. Based on the analysis below, we conclude that this scenario satisfies both prongs of the discretionary function exception to the

VTCA and that sovereign immunity applied to DOC's actions. The trial court appropriately granted summary judgment to the State.

¶ 21. Regarding the first prong of the test, DOC exercised its discretion when investigating the reports of boundary violations. To determine whether DOC was mandated to act in a specific way or was called upon to exercise its judgment in conducting the investigation, we first examine what DOC was required to do under the statutes and policies in place at the time.

¶ 22. There is no dispute that DOC is obligated to protect inmates committed to its care from sexual exploitation. DOC has statutory obligations, as well as regulations and internal policies, governing its actions. Notably, 28 V.S.A. § 601 delegates broad authority and responsibility to DOC officers "for the efficient and humane maintenance and operation and for the security of the facility." Specifically, § 601(2) requires supervising officers to "enforce the provisions of law and the regulations of [DOC] for the administration of the facility, the government of its officers, and the treatment, training, employment, care, discipline, and custody of the inmates." Section 601 also tasks supervising officers with "establish[ing] and administer[ing] rules, including rules for the operation of the facility, consistent with [Title 28] and the general policies and regulations of [DOC]." Id. § 601(7).

¶ 23. At the time of the events outlined above, DOC Policy 126 was the sole policy or directive in place regarding sexual misconduct perpetrated by DOC employees against inmates. DOC enacted Policy 126 in January 2003, prior to both Vermont's adoption of the Prison Rape Elimination Act (PREA) and criminalization of sexual relationships between inmates and correctional officers. See 2005, No. 177 (Adj. Sess.), § 1 (enacting 13 V.S.A. § 3257 and criminalizing sexual exploitation of incarcerated individuals); Vermont Department of Corrections Directive 409.09, Prison Rape Elimination Act (PREA) & Staff Sexual Misconduct (2014) [hereinafter Directive 409.09], http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/409-09-prison-rape-elimination-

10

act-prea-staff-sexual-misconduct-facilities [https://perma.cc/D7XB-ZB93].[3] Policy 126 states in relevant part that DOC "will make serious efforts to prevent employee sexual misconduct with [inmates] and will investigate all reports to ensure accountability for all those who are involved in sexual misconduct." Pursuant to Policy 126, the usual sanction for violations of the sexual-misconduct policy is termination absent strong mitigation for the behavior. The policy further states that DOC will "develop directives that establish processes" for preventing, reporting, and investigating sexual misconduct. Despite this language, DOC did not adopt any additional or different policies, directives, or procedures regarding the investigation of or response to staff sexual misconduct with inmates until it adopted Directive 409.09 in June 2014. Therefore, at the time of the events at issue, the statutes, regulations, and policies in place required DOC to investigate reports of sexual misconduct and sanction officers who engaged in sexual misconduct, but they did not mandate that DOC conduct the investigation in a particular manner or separate alleged perpetrators from alleged targets during investigation.

¶ 24. Although there were no definitive ministerial standards for DOC to adhere to at the time, DOC investigated the allegations of boundary violations between Salls and Ingerson. Specifically, it is undisputed that DOC supervisors took the following actions: they met with Salls and questioned her about her interactions with plaintiff, which she assured them complied with DOC's policies; cautioned Salls about spending an inappropriate amount of time with plaintiff and warned her about DOC's intolerance for sexual misconduct with inmates; requested that DHR interview Salls and plaintiff regarding the boundary-violation reports (both Salls and plaintiff denied any sexual misconduct was occurring); repositioned cameras to monitor areas frequented

---

[3] DOC adopted Directive 409.09 on June 2, 2014. A new version of Directive 409.09 superseded the 2014 version on February 22, 2015. Vermont Department of Corrections Directive 409.09, Prison Rape Elimination Act (PREA) & Staff Sexual Misconduct (2015), http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/409-09-prision-rape-elimination-act-prea-staff-sexual-misconduct-facilities [https://perma.cc/ZR8Y-RL5S].

by Salls and plaintiff; and continued watching and receiving information about Salls's behavior. When DOC received a report that Salls had made direct sexual contact with plaintiff, she was immediately removed from the area of the facility to prevent future contact with plaintiff. These actions required DOC to exercise its judgment and balance competing interests, such as: weighing the evidentiary value of the boundary-violation reports and drawing conclusions from them; protecting inmates from legitimate concerns while avoiding the appearance of undermining officer authority; balancing the security risks due to inmate liberty with the rehabilitative benefits of allowing inmates as much freedom as possible; allocating and managing resources and staff; and considering officers' contractual and other rights.

¶ 25. DOC engaged in this balancing, and it did so without the benefit of directives or guidelines beyond Policy 126's general mandate that an investigation ensue. See Earle, 2006 VT 92, ¶ 26 (holding state employees' discretionary decisions while investigating allegations of sexual abuse without specific guidelines or procedures fell within ambit of discretionary function exception).[4] As we have explained, we generally afford DOC broad discretion in making these types of administrative decisions due to the complex nature of managing correctional settings. Conway, 161 Vt. at 115, 636 A.2d at 736. We see no reason to depart from that principle here. DOC's actions required the exercise of judgment, satisfying the first prong of the discretionary-function-exception test and leading us to the second stage of our inquiry. Lane, 174 Vt. at 224,

---

[4] Plaintiff attempts to distinguish Earle, 2006 VT 92, from this case because the Vermont Department for Children and Families (DCF) does not have the same statutory duty to foster families that DOC has to inmates and because DCF had no ministerial requirements for investigating while Policy 126 instructed DOC to create investigation procedures. We disagree with plaintiff's analysis. First, both DCF and DOC have a similar duty to investigate allegations of sexual abuse—the differences between foster-family and inmate populations are irrelevant to our analysis in this context. Second, even though Policy 126 indicates DOC's intent to adopt investigation polices, none were in place at the time of the investigation at issue. Due to the lack of ministerial guidelines in both cases, DOC and DCF workers were similarly situated and required to exercise their discretionary judgment in both instances. We find these two cases to be substantially similar, bolstering our conclusion that the discretionary function exception applied to DOC's investigation here, as it applied to DCF's investigation in Earle.

811 A.2d at 194 (explaining that "[i]f the court determines that the act involved an element of judgment or choice, it must then decide . . . the second prong").[5]

¶ 26. The second prong of the test requires us to consider whether the decisions made by DOC during the investigation were of the kind that the discretionary function is intended to protect—decisions affecting public policy. Kennery, 2011 VT 121, ¶ 32. As discussed above, because DOC exercised its judgment in conducting the investigation, we presume its decisions involved matters of public policy. Earle, 2006 VT 92, ¶ 23. This presumption is again bolstered by the discretion generally afforded to prison administrators' decision-making authority and the sensitive nature of the investigation at issue. We recognize that sexual-misconduct investigations are highly sensitive and, when conducted in carceral environments, pose unique challenges. We agree with DOC that balancing the competing interests at stake (outlined above) is a process highly "susceptible to policy analysis." Kennery, 2011 VT 121, ¶ 32 (quotation omitted). To overcome the presumption in DOC's favor, plaintiff is tasked with demonstrating that DOC's decisions made during the boundary-violations investigation were "unrelated to any plausible policy objective," Coulthurst, 214 F.3d at 111, such as failing to inspect weight-room equipment, id., or mistakenly

---

[5] Plaintiff argues that because DOC exercised its discretion conferred by 28 V.S.A. § 601 and enacted Policy 126, DOC assumed a ministerial duty to effectuate the policy by establishing procedures for investigating allegations of sexual exploitation. However, our case law consistently explains that ministerial duties are duties conferred by statutes, regulations, or policies that "involve a predictable standard for decision making," Sabia, 164 Vt. at 307, 669 A.2d at 1197, and "specifically prescribe[] a course of action for an employee to follow." Lane, 174 Vt. at 224, 811 A.2d at 194. Policy 126's general commendation that DOC establish policies and procedures for investigating sexual-exploitation reports lacks the specificity of ministerial guidance—there are no clear parameters or steps for DOC employees to follow. While this language indicates DOC's intent to adopt future procedures, it does not require DOC to do so or set any time by which those procedures must be adopted. Accordingly, Policy 126 does not align with examples of ministerial guidance found in our case law. See Wool, 2018 VT 23, ¶ 15 (holding that awarding contract for telephone services was nondiscretionary, ministerial act because it did not require exercise of DOC's judgment to identify "lowest responsible bidder[]"); Kennery, 2011 VT 121, ¶¶ 35-36 (holding that conducting welfare check at wrong address did not involve judgments affecting public policy). DOC's choice not to exercise its discretion and adopt further policies by the time of Salls's misconduct was a matter of judgment, not dereliction of a ministerial duty as alleged by plaintiff.

13

conducting a welfare check at the wrong address. Kennery, 2011 VT 121, ¶¶ 35-36. Plaintiff has failed to meet that burden. Here, DOC had to make decisions in response to allegations of abuse and "weigh the competing governmental policies" at issue. Earle, 2006 VT 92, ¶ 23 (quotation omitted). Those judgments are precisely of the kind that the discretionary function was designed to shield. We determine that DOC satisfies both prongs of the test and the discretionary function exception applies.

## II. DOC Did Not Waive Sovereign Immunity

¶ 27. Plaintiff makes three primary arguments countering the applicability of the discretionary function exception. He argues that DOC waived sovereign immunity because it: (1) unreasonably delayed enacting investigatory procedures, pursuant to Policy 126; (2) failed to provide an adequate response when investigating the allegations by electing not to separate Salls and plaintiff; and (3) negligently executed ministerial decisions within the investigation. We address each in turn.

### A. Unreasonable Delay

¶ 28. Plaintiff asserts that DOC waived sovereign immunity by beginning and failing to complete a discretionary task (adopting Policy 126 but not establishing further investigation procedures) in a reasonable manner. We disagree.

¶ 29. DOC was not required to adopt investigation procedures. As explained above, DOC enacted Policy 126 pursuant to its discretionary authority under 28 V.S.A. § 601. Policy 126 stated DOC's intent to establish investigation procedures, but it did not specify when or how DOC should enact such procedures and did not require DOC to take any further action. See supra, ¶ 25 n.5. Enacting Policy 126 and establishing investigation procedures, which DOC achieved by adopting a directive to implement the PREA in 2014, were distinct discretionary acts that each required DOC to exercise judgment and balance competing policy interests. This is unlike the cases cited by plaintiff in which an agency began a single undertaking at its discretion, such as

electing to operate a lighthouse, and then failed to carry out ministerial functions to ensure the same project's success, such as providing routine maintenance for the lighthouse. See, e.g., Indian Towing Co., 350 U.S. at 69. DOC completed one discretionary act by enacting Policy 126 and later performed another discretionary act by adopting a directive to implement the PREA. Plaintiff's argument attempting to conflate these two acts into one, drawn out undertaking is unpersuasive.

¶ 30.   Even if we were to agree that Policy 126 obligated DOC to establish procedures, plaintiff's reliance on national case law to argue that DOC unreasonably delayed in doing so would be misplaced. Plaintiff draws his definition of "unreasonable" agency delay from case law involving "TRAC" analysis, which differs significantly from this case. See Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 79-80 (D.C. Cir. 1984) (establishing "TRAC" test). We briefly summarize this case law and its statutory origins to explain and reject plaintiff's argument.

¶ 31.   To ensure agency accountability to its enabling legislation, "Congress has instructed statutory review courts to compel agency action that has been unreasonably delayed" under 5 U.S.C. § 706(1). Telecomms. Research & Action Ctr., 750 F.2d at 79. In other words, if an agency does not comply with its statutory mandate, a party may challenge the agency's inaction via § 706(1). When resolving suits brought under this provision, federal courts have applied a six-factor analytical framework called "TRAC" analysis to determine whether an agency has exhibited "unreasonable delay" in effecting its objectives and whether it is appropriate to compel agency action. See id. at 79-80 (holding that Federal Communications Commission's delay of almost five years in resolving overcharge claims did not warrant writ of mandamus); see also Martin v. O'Rourke, 891 F.3d 1338, 1341, 1349 (Fed. Cir. 2018) (holding that "Veterans Court should look to the TRAC factors as guidance when evaluating mandamus petitions based on unreasonable delay in the [Department of Veterans Affairs'] adjudication of benefits claims," which are "nondiscretionary, statutorily mandated benefits" (quotation omitted)); In re Int'l Chem. Workers

15

Union, 958 F.2d 1144, 1148, 1150 (D.C. Cir. 1992) (per curiam) (issuing order for Occupational Safety and Health Administration (OSHA) to complete cadmium rulemaking pursuant to OSHA's statutory mandate after six-year delay). Notably, recent courts applying TRAC analysis have emphasized that "an agency cannot unreasonably delay that which it is not required to do." In re A Cmty. Voice, 878 F.3d 779, 784 (9th Cir. 2017); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting in context of mandamus based on 28 U.S.C. § 1361 that agency must owe petitioner "clear nondiscretionary duty").

¶ 32. With this background in mind, we address plaintiff's argument.[6] Plaintiff attempts to prove DOC's sovereign immunity should be waived by comparing the length of the agencies' "unreasonable delay" in the federal TRAC cases to DOC's alleged delay in enacting investigation procedures pursuant to Policy 126. However, this case is not analogous to the TRAC cases, most notably because Policy 126 is an internal policy, not a statutory mandate, and because plaintiff is seeking damages from the State, rather than asking this Court to compel DOC to comply with Policy 126.[7] In this case, we are not persuaded that DOC's delay in exercising its discretion is akin to an agency's delay in executing a clear statutory mandate. DOC exercised its judgment

---

[6] The State argues that plaintiff's claim—that the discretionary function exception does not apply because federal case law demonstrates DOC unreasonably delayed in adopting Policy 126—was not raised before the trial court and is not preserved for appeal. However, this line of analysis supports the argument plaintiff made to the court that the discretionary function should not apply to DOC's investigation because DOC "attempt[ed] to exploit a loop hole that was negligently self-created" when DOC "did not adopt uniform procedures or directives, as stated in Policy 126." The trial court considered and rejected this argument, which plaintiff attempts to resurrect on appeal by pointing to federal case law. See Avery v. Estate of Avery, 2018 VT 59, ¶ 9 n.3, __ Vt. __, 192 A.3d 1250 ("[W]here a litigant's argument is clear enough for the trial court to evaluate it and for an opponent to respond to it, the claim is adequately preserved for appeal." (quotation omitted)). Therefore, the issue is preserved.

[7] Between the time DOC established Policy 126 and DOC's adoption of a directive to implement the PREA, no party sued seeking to compel DOC to establish investigation procedures. To date, we have not adopted TRAC analysis in Vermont, and we do not address whether TRAC analysis would apply to a suit seeking to compel DOC to act on an internal policy, such as Policy 126, or whether such a suit would be successful.

pursuant to its enabling statute (28 V.S.A. § 601) and internal policy (Policy 126) when deciding whether to adopt investigation procedures. Both § 601 and Policy 126 delegated broad authority to DOC—neither required DOC to establish procedures nor specified how DOC should achieve that goal. In contrast, the agencies in TRAC case law were subject to enabling statutes that required specific action and arguably functioned like ministerial guidelines. Unlike DOC, the agencies in TRAC case law were statutorily obligated to act. Martin, 891 F.3d at 1340-41, 1349 (explaining that Department of Veterans Affairs (VA) benefits are "nondiscretionary statutorily mandated benefits" and VA had duty to adjudicate and issue final decisions on these pending claims for disability benefit (quotation omitted)); In re A Cmty. Voice, 878 F.3d at 784 (explaining that if agency does not have nondiscretionary duty to petitioner to act, agency cannot unreasonably delay taking such act). Because of these differences, plaintiff's comparison between this case and the TRAC cases fails.

¶ 33. Even if the unreasonable delay in the TRAC cases provided a more perfect parallel to this case, the remedy in TRAC cases is compelling agency action, not a money claim for damages. Compelling agency action is inapplicable here because DOC has already established investigation procedures by adopting the PREA. Plaintiff has not pointed to a case where an agency's decision not to exercise its discretionary authority based on an internal policy constituted "unreasonable delay" and the appropriate remedy was a waiver of sovereign immunity and damages, yet he asks us to provide such a remedy here. For the reasons outlined above, we refuse to usurp the concept of unreasonable delay from TRAC case law and graft it onto the discretionary-function-exception test to justify the remedy sought by plaintiff.

¶ 34. Finally, even if we agreed with plaintiff that DOC had a duty to adopt investigative procedures pursuant to Policy 126 and failed to do so in a reasonable time frame, summary judgment in favor of the State is still appropriate because it is entirely speculative that DOC's inaction caused plaintiff's harms or that enacting such policies would have prevented plaintiff's

sexual exploitation. For example, we cannot know whether DOC would have adopted procedures requiring that alleged perpetrators of misconduct be separated from alleged targets during investigation or prescribing a method for positioning facility cameras, as suggested by plaintiff. Even assuming such procedures had been put in place, the events at issue still may have occurred, especially with both Salls and plaintiff actively working to conceal their meetings. Taking the facts in the light most favorable to plaintiff and crediting that he was coerced to obstruct DOC's investigation, the investigation was undisputedly subverted due to plaintiff's actions and untruthful denials, preventing DOC from discovering Salls's sexual misconduct at an earlier time. Plaintiff asks us to speculate both as to the content of any unadopted policy and whether it would have prevented some of plaintiff's damages had it been adopted. This we decline to do.[8]

---

[8] Plaintiff argues that granting summary judgment to the State in this case will encourage government agencies not to enact policies in order to hide behind the discretionary function exception and insulate themselves from future tort claims. However, the discretionary function exception is not a get-out-of-jail-free card for bad government behavior—there are limits to its applicability. Had DOC failed to take any action in response to the boundary-violation concerns or sexual-misconduct reports or acted contrary to its statutory or internal mandates in attempting to determine their veracity, the discretionary function exception would not shield it from suit. See Sabia, 164 Vt. at 307-08, 669 A.2d at 1196-97. But this is not the case here. DOC acted in response to the allegations that were raised and ultimately uncovered Salls's misconduct. We are unpersuaded that agencies will fail to act or refuse to adopt policies with the uncertain hope that the discretionary function exception will apply and/or their ministerial actions, if any, will be deemed reasonable.

As plaintiff pointed out by highlighting TRAC case law, the legislative and judicial branches also aid in ensuring agency accountability. "[U]nder our constitutional system, administrative agencies are subject to the same checks and balances which apply to our three formal branches of government. An agency must operate for the purposes and within the bounds authorized by its enabling legislation, or this Court will intervene." In re Agency of Admin., State Bldgs. Div., 141 Vt. 68, 75, 444 A.2d 1349, 1352 (1982). If an agency fails to perform acts as required by its enabling statute, then a party may bring suit seeking the courts to compel agency action to perform its statutory obligations. See V.R.C.P. 75 ("Any action or failure or refusal to act by an agency of the state or a political subdivision thereof, including any department, board, commission, or officer, that is not reviewable or appealable under Rule 74 of these rules . . . may be reviewed in accordance with this rule if such review is otherwise available by law."); V.R.C.P. 74 (providing for appeals from decisions of governmental agencies when party is entitled to seek review by statute).

18

### B. DOC's Decision Not to Separate Salls and Plaintiff

¶ 35. Even accepting that the discretionary function exception applies, plaintiff argues that sovereign immunity must be waived because DOC's investigation was inadequate. Specifically, plaintiff argues that based on the internal reporting of inappropriate interactions between Salls and plaintiff, DOC should have separated the two during the investigation. Even taking the undisputed facts as true and resolving all inferences in plaintiff's favor, DOC's decision not to separate Salls and plaintiff was part of DOC's exercise of judgment in conducting the investigation, and it is shielded by the discretionary function exception.

¶ 36. The discretionary function exception applies to government agencies' administrative and policymaking decisions made pursuant to their statutory mandate. Earle, 2006 VT 92, ¶ 22; see also id. ¶ 30 (Johnson, J., concurring) ("[T]he agency cannot claim immunity under the discretionary function exception by simply taking some action, no matter how token, in response to a report of abuse; its response must be sufficient to satisfy the mandatory requirements of the statute."). Once the government makes a policy decision protected by the exception, agencies must use due care when executing ministerial tasks in furtherance of a discretionary undertaking. Caplan, 877 F.2d at 1316. However, discretionary acts furthering the State's protected policy decision—here, DOC's investigation—are likewise protected by the exception. Gaubert, 499 U.S. at 323.

¶ 37. At the time of the events at issue, § 601 and Policy 126, read together, required that DOC "take proper measures to protect the safety of the inmates and personnel of the facility" and investigate allegations of sexual misconduct. Neither § 601 nor Policy 126 required, or even suggested, that DOC separate accused officers and alleged targets during sexual-misconduct investigations or investigations into boundary-violation reports—electing whether to do so was a discretionary judgment. Unlike maintaining a lighthouse or properly locating a hazard on a navigational chart—which are ministerial acts that "involve[] no discretionary function or duty"—

19

DOC's staffing decision in the face of concerns regarding contact between Salls and plaintiff required an exercise of judgment. See Indian Towing Co., 350 U.S. at 69; Myslakowski v. United States, 806 F.2d 94, 98 (6th Cir. 1986). No statutes, policies, or standards dictated DOC action under the circumstances, and DOC's investigation yielded no evidence indicating separation was necessary, largely due to Salls's and plaintiff's falsehoods. Whether we would make a different decision in hindsight is not the test; the test is whether DOC's acts were sufficient to satisfy the mandatory requirements and whether they necessitated the exercise of judgment. Even taking the facts and all reasonable inferences in a light favorable to plaintiff, DOC's choice not to separate the two met this standard.

¶ 38. Plaintiff laments that "[t]he standard for protecting Vermont inmates should not hinge on catching someone in the act." We agree. However, in this case, Salls's and plaintiff's intentional acts undermined DOC's attempts to discover Salls's misconduct, which would have triggered a DOC response.[9] Considering the complexity of the investigation, lack of clear guidelines, and competing interests at issue, we cannot now second-guess DOC's decision not to separate Salls and plaintiff when both repeatedly told investigators that no misconduct was occurring and separation was apparently unnecessary. The discretionary function exception is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, 467 U.S. at 814. Allowing plaintiff to attack the wisdom of DOC's discretionary judgments made within the course of its investigation would open the door to exactly the type of

---

[9] In pointing to plaintiff's statements to investigators, we do not intend to suggest that plaintiff, as victim, was blameworthy for misrepresenting the facts. We are mindful of the dynamics that might lead an incarcerated individual to lie to investigators in a case like this. The point of our discussion is that, from the perspective of DOC, plaintiff's denials of any sexual contact by Salls is relevant to the discretion DOC officials retained to separate, or not separate, Salls from plaintiff.

judicial scrutiny the exception was intended to prevent. We reject plaintiff's claim that DOC's decision waived sovereign immunity.[10]

## C. Negligent Ministerial Decisions

¶ 39.    In addition to plaintiff's claim that the failure to adopt procedures was a breach of a ministerial duty, which we have rejected (see supra, ¶ 25 n.5), plaintiff also claims that DOC breached ministerial duties in the course of its investigation, resulting in harm to plaintiff and waiving sovereign immunity. Plaintiff challenges two specific decisions as the bases for this claim—the repositioning of the camera and the misreading of Salls's employment contract. In the absence of any clear instructions requiring DOC to take either action, we conclude that these decisions were discretionary. Even if we agreed that these acts were ministerial, which we do not, plaintiff's arguments fail because any harm to plaintiff due to these actions by DOC is purely speculative.

¶ 40.    First, plaintiff argues that repositioning the camera to eliminate blind spots in the facility was poorly and negligently done. He compares the repositioning of the camera, which must have involved some delegation, to acts that have been recognized as ministerial, such as the welfare check at the wrong house in Kennery, 2011 VT 121, ¶ 36, and "the actual cleanup of vomit" in Allen v. Kansas Department of Social & Rehabilitation Services, 731 P.2d 314, 316 (Kan. 1987). As we have explained, ministerial acts are those with clearly prescribed directives. Lane, 174 Vt. at 224, 811 A.2d at 194. In the absence of such directives explaining that cameras should be used when investigating reports of boundary violations or how to position them, the use

---

[10] We address the exception's applicability to DOC's decision regarding separating Salls from plaintiff in response to plaintiff's challenge; however, we leave for another day whether it is generally necessary to analyze each individual decision within an agency's discretionary acts to determine whether it is protected by the exception. See Gaubert, 499 U.S. at 334 (Scalia, J., concurring) (disagreeing with majority as to whether "it [is] necessary to analyze individually each of the particular actions challenged" within activity protected by discretionary function exception).

of the camera, its placement, and the choice to move it back to its original position were decisions within DOC's discretion when conducting the investigation.

¶ 41. Even if we were to agree that positioning the camera was a ministerial act and it was done badly, there is no evidence beyond mere speculation that a change in camera position would have had an impact on Salls's misconduct such that waiver of DOC's sovereign immunity is appropriate. Salls and plaintiff were actively seeking to hide the ongoing sexual misconduct. Whether a change in the camera's position would have countered their efforts and led to their discovery by DOC cannot be known. We decline to hold that the potentially ineffective repositioning of the camera waives DOC's sovereign immunity for conducting the investigation.

¶ 42. Next, plaintiff argues that DOC's rationale for not switching Salls's post earlier was based on a misreading of her rights under the union contract and that "familiarity with the collective bargaining agreement is a ministerial task put upon facility management." We disagree. At the time at issue, there were no requirements that DOC prohibit contact between Salls and plaintiff or that DOC remove Salls from Echo Unit during the investigation. DOC's decision not to remove Salls was discretionary and implicated competing policy rationales—allocating staff, interpreting the employee contract, and making decisions that keep inmates safe while not undermining staff authority, among others. Even if one element of DOC's reasoning was flawed—such as a mistaken interpretation of the contract—the decision not to separate Salls and plaintiff in the wake of boundary-violation allegations was a multifactored judgment within the discretionary authority of facility supervisors. We cannot accept that DOC's potential error regarding the contract terms waives its immunity under the discretionary function exception. And, as explained above, even if interpreting the contract was a ministerial decision as alleged by plaintiff, is it entirely speculative whether a different interpretation would have incentivized DOC to separate the two, especially in the face of the other management concerns outlined above. Plaintiff asks us to speculate that if DOC had correctly construed the contract, then DOC would

have separated Salls from plaintiff and plaintiff's harms would not have occurred. We cannot indulge in this type of conjecture.

¶ 43. Ultimately, DOC exercised judgment regarding matters of public policy when investigating the allegations against Salls without the benefit of ministerial guidelines. Because DOC's investigation satisfies both prongs of the discretionary-function-exception test, and we are not persuaded by plaintiff's arguments that DOC waived this protection, sovereign immunity applies. We affirm the court's grant of summary judgment in favor of the State. Because we conclude that the discretionary function exception applies, we do not consider plaintiff's negligence claim against DOC.

Affirmed.

FOR THE COURT:

Associate Justice